# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

A Samsung SM-J337R4 cell phone, IMEI 35213910072761, associated with telephone number 920-763-3324, further described in Attachment A.

Case No. 19-MJ-1387

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. § 1591(a)(1)(b)(1), 1591(a)(1) and (b)(2), 1594(b) and 1594(d).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Blake Shubert, FBI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: 12/20/19

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin                    Honorable William E. Duffin , U.S. Magistrate Judge
                                                        *Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Blake Shubert, being first duly sworn, hereby depose and state as follows:

## I. Agent Background & Experience

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and I have been so employed since July 7, 2019. I am assigned to the Violent Crimes Squad (VC-1) in the Milwaukee Field Office, where I work human trafficking matters as part of the Wisconsin Human Trafficking Task Force.

2.      As part of my duties, I investigate the illegal trafficking of persons for the purposes of labor and commercial sex acts. My formal training and experience includes the FBI Academy in Quantico, Virginia, where I received comprehensive training in a variety of investigative and legal matters. This included conducting criminal investigations, drafting and executing search and arrest warrants, and interviewing witnesses, victims, and subjects. Since joining my squad in Milwaukee, I have gained experience supporting multiple investigations and consulting with law enforcement partners employed by local, state, and federal law enforcement agencies.

3.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from citizen witnesses, and information reported to me by other law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

4.      Throughout this affidavit, "case agents" refers to the federal, state, and local law enforcement officers who have participated directly in this investigation, and with whom I have had regular contact regarding this investigation. The case agents in this investigation have included law enforcement officers from the FBI, the Green Lake County Sheriff's Office (GLCSO), Immigration and Customs Enforcement—Enforcement and Removal Operations (ICE-ERO), the

Department of Labor—Office of the Inspector General (DOL-OIG), the Wisconsin Division of Criminal Investigation (DCI), the Madison Police Department, and the Markesan Police Department.

5.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## II.     Purpose of Affidavit

6.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a Samsung SM-J337R4 cell phone, IMEI 35213910072761, associated with telephone number 920-763-3324, which is presently securely stored in an evidence locker at the Green Lake County Sheriff's Office (GLCSO), and which is fully described in Attachment A, for the things described in Attachment B, by means of a forensic examination.

7.      In my training and experience, I know that the cell phone has been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when they first came into the possession of GLCSO.

## III.    Probable Cause

### A.    Overview

8.      On November 28, 2019, GLCSO received a 911 call from Juvenile Victim 1 (hereinafter "JV-1"), a 17-year-old female. JV-1 reported that she was calling from the bathroom of a residence located at WXXXX County Line Road in Randolph, Wisconsin, where she was being held against her will by men who were sexually assaulting and trafficking her.

2

9.     During the call, JV-1 noted that she was leaving the residence and walking along the roadway. JV-1 was advised to get as far away from the address where she was being held as possible and that deputies were enroute to locate her.

10.     The investigation that followed revealed that JV-1 was a foster child from Madison, Wisconsin who had been reported missing since June of 2019. According to JV-1, individuals named "Cesar Velveta" (identified as Julio Cesar Veleta Veleta, DOB 12/20/84), and "Kimberly Stevens," (identified as Kimberly Stevens, DOB 09/13/87), had taken JV-1 from Madison to the County Line Road house in Green Lake County, which is a residence where dairy farm workers were housed.

11.     These dairy farm workers, undocumented men from Guatemala, were paying to have sex with JV-1. Money paid for the sex acts was being collected by Evis Amabilio Garcia Rivera, AKA "Eddie," DOB 04/17/88, who was also living at the house on County Line Road. Garcia Rivera was also driving JV-1 to other similar houses in Green Lake County and Fond du Lac County where other agricultural workers were paying for sex with JV-1.

12.     GLCSO obtained a warrant to search the house on County Line Road. Inside, they located several subjects who admitted to paying for sex with JV-1. They later interviewed others who were living in the house but not present at the time of the search warrant. Each of them either admitted to paying for sex with JV-1 or to knowing that other occupants of the house did so.

13.     One of the subjects from the County Line Road house, Noe Bautista Martinez, had an eight-year-old son, A.M., living there with him. When Bautista Martinez and the other subjects were arrested, A.M. was placed with relatives in the area and assigned a social worker.

14.     A.M. made disclosures about his awareness of JV-1 in the home and statements that indicate to me that there is evidence related to crimes against her in a phone that he used.

3

15.     This search warrant is being sought to search the phone used by A.M. for evidence of federal crimes, including sex trafficking of a child in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(2); sex trafficking by force, fraud, and coercion, in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1); conspiracy to engage in sex trafficking, in violation of Title 18, United States Code, Section 1594(b); and attempted obstruction of a sex trafficking investigation in violation of Title 18, United States Code, Section 1594(d).

## B. Information from JV-1

### i. November 28-29, 2019

16.     When GLCSO first made contact with JV-1 on November 28, 2019, she disclosed that she was 17 years old. She stated that she had been in foster care in June 2019 when "Cesar Velveta" (Julio Cesar Veleta Veleta) and Kimberly Stevens brought her from Madison to Green Lake. JV-1 stated that Stevens was a friend of her biological father.[1]

17.     JV-1 was confirmed as a missing juvenile from Dane County as of June 2019. Based on her date of birth, JV-1 was 16 years old at that time.

18.     JV-1 explained that the adult male subjects she was staying with in the house on County Line Road were nice to her at first, but that they eventually became sexually abusive toward her and also started sending her out to have sex with other men on farms in Green Lake County and Fond du Lac County in exchange for money that they kept for themselves.

19.     JV-1 believed that there were approximately three other women or girls who were being exploited sexually in the same way that she was on these farms. Although JV-1 did not know them, she had seen some of them at the houses where she was taken for short periods of

---

[1] Later, JV-1 clarified that Stevens had claimed to know her father, but she was not certain whether this was true.

4

time. JV-1 also understands some Spanish, and she overheard the subjects to discussing these other females on various occasions. She believed from the conversations she heard that they were considering sending some of these women and girls, or had sent some of them, to Guatemala or Mexico.

20.     While deputies were speaking with JV-1 in a squad car, JV-1 recognized Evis Amabilio Garcia Rivera's car, a black Chevy Blazer, driving by. Deputies ran the plates of the vehicle and determined that it was registered to Garcia Rivera. They then stopped the vehicle, and Garcia Rivera was found to be the driver.

21.     JV-1 disclosed that Garcia Rivera had had sex with her earlier that day. The deputies asked JV-1 to make a positive identification of Garcia Rivera, and she became visibly upset and began crying. After assurances that they would make sure Garcia Rivera could not see her, JV-1 made the identification from the squad car.

22.     JV-1 explained that she had been locked in the basement of the residence, however the lock was not strong. After she heard several of the subjects leave the house, she was able to break open the door. When she emerged from the basement, she saw a cell phone sitting unattended on a table and used it to dial 911.

23.     Garcia Rivera was taken into custody, and JV-1 was brought back to GLCSO where she was asked additional questions. JV-1 explained that she had met Veleta Veleta and Stevens at a party and that they had offered to take her to a place where she would be taken care of. She stated that she initially agreed to go with them.

24.     JV-1 stated that, in the beginning, she was assisting with housekeeping at the house on County Line Road. After approximately a week or two, several of the subjects in the house held her down and forced her to have sexual intercourse with them.

5

25. JV-1 described that she was also taken to NXXX County Highway A thereafter, and that the occupants of that house also forced her to have sex with them. After roughly two weeks at that location, she was transported to yet another farm where something similar occurred again.

26. JV-1 described some of the individual incidents of sexual assault at both houses. She also stated that it appeared everyone was exchanging money in conjunction with the sexual assaults, such that she believed these were payments for having sex with her. She specifically named Garcia Rivera as taking some of the money.

27. When asked about the phone JV-1 had taken from the house and used to call 911, JV-1 indicated that she did not know who it belonged to, but the subjects would have her use the phone to tell people she was ok and to talk to people in Guatemala.

28. When JV-1 was asked if anyone ever took pictures of her, she stated that there would be photos of her in Garcia Rivera's phone. When asked if there were nude photos, she stated she did not know. She stated that the subjects took nude photos of her "all the time," but she does not know how they store these photos or what phone or phones they might be on. JV-1 added that the subjects had been using her Facebook account to talk to other people.

29. At this point, the interview was suspended, and JV-1 was transported to a hospital for a sexual assault nurse examiner (SANE) examination. During the ride to the hospital, JV-1 began speaking about the subjects again. She described the sexual encounter with Garcia Rivera that day was a violent one. Garcia Rivera took her to his room, held her down, choked her, and began having sex with her. When JV-1 pushed Garcia Rivera off, he pushed her face down and penetrated her anally.

6

30.     Once at the hospital, JV-1 additionally disclosed that five other adult residents of the house on County Line Road had also had sex with her by force, threats of force, or intimidation on occasions in the recent past. JV-1 admitted that there had been so many incidents of this kind that she was somewhat unclear on the exact way in which each individual incident had taken place. She was able, however, to describe at least one distinct incident with each of the six subjects she named (including Garcia Rivera), who are discussed in greater detail in section D below.

31.     JV-1 stated that everyone in the house was calling her a prostitute but that she was not a prostitute. She also stated that she saw money exchanged among the subjects in the house. When asked who received the money, JV-1 stated specifically that she had seen Garcia Rivera receive some, but she was not certain what is was for.

32.     JV-1 told the interviewing detective that she believed there would be evidence on the subjects' cell phones relating to her presence in the houses and to her sexual exploitation. JV-1 stated that the subjects took photographs of her on occasion. She also stated that she had seen Garcia Rivera posting photographs of her online. JV-1 believed that Garcia Rivera had posted some of these photographs on a Facebook account under the name "Catalina Arias," which he used to impersonate her.

33.     Law enforcement located the Catalina Arias Facebook page, which appeared to have only a few public posts going back to August 2019. These posts were a handful of pictures of JV-1.

## ii.     December 4, 2019 Interview

34.     JV-1 was interviewed again on December 4, 2019. She recounted and confirmed many of the details she had originally disclosed, including that the subjects became sexually violent with her within a short period of time after her arrival in Green Lake County, and that she

7

had seen money changing hands between the subjects when they would have sex with her, but that she was not certain it was payment for the sex acts that occurred.

35.    JV-1 stated during this interview that, in June 2019, Veleta Veleta and Stevens had forced her into a car outside of her foster home. She explained that she knew Stevens previously through a friend named Kendria Perez (DOB 3/19/94), but she had never met Veleta Veleta before.

36.    JV-1 stated that Veleta Veleta and Stevens took her to an apartment on Allied Drive in Madison near a McDonald's. She stated that they were nice to her at first, and that Stevens acted as a mother figure toward her and took care of her, but that after a week or so they became "mean." From there, Veleta Veleta and Stevens took her to Green Lake County. Cesar dropped her off at the house on County Line Road and collected money from Evis Amabilio Garcia Rivera.

37.    During this interview, JV-1 stated that she did not know if any of the subjects at the County Line Road house had taken pictures of her, however she knew that Garcia Rivera had at least one photograph of her in his phone. Law enforcement agents confirmed that the lock screen on the phone that Garcia Rivera gave consent to search had a photograph of JV-1 wearing a tight, black mini-skirt.

### iii.    December 5, 2019 Interview

38.    JV-1 was interviewed again on December 5, 2019 with a focus on the parts of this series of events that had taken place in Madison, Wisconsin. JV-1 again stated that the male and female she knew as Cesar (Julio Cesar Veleta Veleta) and Kimberly (Kimberly Stevens) had taken her from outside of her foster home in June 2019 and eventually trafficked her to Green Lake County.[2]

---

[2] It should be noted that the report of JV-1's December 5, 2019 interview sates that JV-1 previously identified Cesar as "Cesar Williams" during her interview on December 4, 2019. This is incorrect. The report of JV-1's December 4, 2019 interview correctly states that she identified him as "Cesar Velveta," the same name she knew him by on

8

39.     JV-1 again stated that Stevens and Veleta Veleta took her to an apartment on Allied Drive. She elaborated that Kendria Perez came and helped Veleta Veleta and Stevens to carry her into the apartment against her will. there were a number of adult males and females at this apartment, some of whom were using drugs. JV-1 stated that several of the men in the apartment forcibly sexually assaulted her on multiple occasions. She also indicated that she was repeatedly threatened with violence or death should she disclose to anyone what had happened.

40.     JV-1 also added that Veleta Veleta and Stevens took her to a different apartment at XXXX Allied Drive, Apartment 3, in Madison, on two occasions. On these occasions, they left her with a man she knew as "Juan Olmeto." Juan and his roommate each sexually assaulted her each day she was there. JV-1 was taken to this apartment twice. Based on Madison Police Department records for XXXX Allied Drive, Apartment 3, "Juan Olmeto" is believed to be Juan Olmedo Lucio (DOB 08/19/76).

41.     JV-1 believed that Perez may have gotten money from one of the men who had sex with her at the first house on Allied Drive. She also saw money exchanged between multiple parties, including Perez, Stevens, Veleta Veleta, and another adult female.

42.     JV-1 indicated that Stevens also received a wad of cash from Olmedo Lucio. Thereafter, Stevens drove her to Sun Prairie where they met up with Veleta Veleta at a Burger King. There, they got into Veleta Veleta's car and traveled to Green Lake. Stevens gave Veleta Veleta a portion of the cash she had received from Olmedo Lucio.

---

November 28, 2019. During that interview, she also positively identified him from a photo taken from Julio Cesar Veleta Veleta's Facebook account.

### iv.     December 17, 2019

43.     On December 17, 2019, other federal agents and I met with JV-1. The primary purpose of the meeting was to introduce ourselves to JV-1, however some clarification questions were also asked, and JV-1 made some additional disclosures.

44.     JV-1 stated that the subjects in this case would often communicate with her using the Google Translate application on their phones. I know from experience that this application can translate spoken or written words from one language to another in real time. I also know that the Google Translate application is capable of storing past searches and translations.

45.     I have reviewed portions of a phone used by JV-1, which JV-1 had given consent to search. Contained in that phone were multiple Google Translate entries dating back to at least October 2019. These entries appear to be JV-1 translating statements made in English into Spanish.

### C. Subject Interviews

46.     Between November 29 and 30, 2019, six of the adult residents of the County Line Road house were located and interviewed by law enforcement. Five of the six admitted to paying for sex acts with JV-1. As JV-1 is a minor, and as she had identified each of them as having sex with her against her will, all six were arrested.

47.     The house had two additional residents, whom JV-1 identified as "Denis" and "Neri." JV-1 had originally indicated that these individuals did not have sex with her, however, as noted above, she amended that statement with respect to Denis on December 17, 2019.

48.     Federal law enforcement located and interviewed Denis Garcia Rivera (DOB 8/25/98) and Neri Perez Esquivel (02/01/93) on December 15, 2019. They stated they did not pay for sex with JV-1, but they indicated that others in the County Line Road house did.

10

### i. Ember Rivera, AKA "Robert"

49.     Ember Rivera was located at the residence at the time of the search warrant. He initially denied knowing or having sexual contact with JV-1. Eventually, however, he admitted to paying $50 to have sexual intercourse with her.

50.     Ember Rivera indicated that someone known to him as "Juan" had dropped JV-1 off at the house, and she had only been there a short time.

### ii. Rolando Corado Gonzalez, AKA "Little Hugo"

51.     Rolando Corado Gonzalez was located at the residence at the time of the search warrant. He admitted right away that he knew JV-1 as "Catalina" and that he had paid for sex acts with her. He stated that he was unaware that she is under the age of 18 and said that he never forced JV-1 to have sex with him.

52.     Corado Gonzalez believed that JV-1 was in a romantic relationship with Evis Amabilio Garcia Rivera.

### iii. Noe Bautista Martinez, AKA "Noel"

53.     Noe Bautista Martinez was located at the residence at the time of the search warrant. He admitted to paying $100 for a sex act with JV-1. He stated that someone known to him as "Juan" had brought JV-1, whom he knew as "Catalina," to the home. He believed that JV-1 was the girlfriend or wife of Evis Amabilio Garcia Rivera, or that she was somehow related to him.

54.     Bautista Martinez believed that JV-1 was an adult and that she was receiving the money for the sex acts she performed.

11

### iv. Avelino Sarceno Sarceno

55.    Avelino Sarceno Sarceno was working on the farm and the time of the search warrant on the residence. He was located and interviewed that day.

56.    Sarceno Sarceno initially denied knowing JV-1 or having any sexual contact with her. Detectives explained to him that JV-1 was going to be examined at the hospital and that if any of his DNA was found on her, he could be in trouble for lying to law enforcement.

57.    Thereafter, Sarceno Sarceno admitted to paying JV-1 for sex. He stated that he knew her under the name "Catalina" and that someone he knew as "Juan" and a larger female had brought her to the home. Sarceno Sarceno stated that Juan and Evis Amabilio Garcia Rivera are friends.

### v. Esler Hugo Rivera, AKA "Big Hugo"

58.    Esler Hugo Rivera was in Beaver Dam at the time of the search warrant on the residence. He was located overnight between November 29 and November 30, 2019 and brought to GLCSO to be interviewed.

59.    Esler Hugo Rivera stated that he knew JV-1 as "Catalina." He denied having any sexual contact with her, but he stated he was aware that she was having sex with other men in the home and that they were paying for these sexual encounters.

### vi. Evis Amabilio Garcia Rivera, AKA "Eddie"

60.    Garcia Rivera was interviewed at GLCSO on November 30, 2019. He admitted to having sexual intercourse with JV-1. He stated that in the beginning he paid for sex acts with her but that in the end, she was "giving it away." He denied using physical force against JV-1.

61.    Garcia Rivera admitted that he was aware JV-1 was a minor under the age of 18.

12

62.     Garcia Rivera talked about how JV-1 would go to other homes in the area and have sex with men there. When asked how JV-1 had originally arrived in the area, Garcia Rivera stated that he did not know the name of the person who had brought JV-1.

## D. Search of Garcia Rivera's Cell Phone

63.     At the time of Evis Amabilio Garcia Rivera's arrest on November 29, 2019, he was found to have a cell phone in his possession. During his November 30, 2019 interview, Garcia Rivera gave written consent for detectives to search his phone.

64.     Review of the phone thus far has demonstrated that Garcia Rivera, the subjects from the house on County Line Road, and additional unknown parties frequently use cell phones to communicate about JV-1. Often, their discussions revolve around engaging in sex acts with her.

65.     Detectives initially examined the phone with assistance from Wisconsin State Patrol Trooper Daniel Restrepo, who is fluent in Spanish. They identified several audio-recorded messages sent by Garcia Rivera in the application Whatsapp that appeared to discuss JV-1.

66.     Some messages of note occurred during the evening of November 2, 2019. Garcia Rivera received an audio-recorded message from a Whatsapp contact saved in his phone as "Chunpe." In the recording, JV-1's voice can be heard saying, "No! No phone!" and "Ouch!" Male voices can also be heard, one of which says (in Spanish), "Just rip it." Garcia Rivera responded with a text message in Whatsapp that told "Chunpe" to have a little shame and to turn off his phone.

67.     Later on November 2, 2019, in an audio-recorded message from Garcia Rivera to a Chunpe, Garcia Rivera asked Chunpe in what appeared to be a sarcastic tone, "What are you doing to my poor wife?" Garcia Rivera told Chunpe that he was with someone whom he called "Brian." Garcia Rivera stated that if Brian wanted to "get his stick wet," Garcia Rivera was willing to

13

transport Brian to a location not named in the conversation. Garcia Rivera went on to state that he would not go inside the unnamed location and that Brian would need to pay "her" $50. Garcia Rivera added that Brian should bring condoms. Garcia Rivera reminded Chunpe that Garcia Rivera's "wife" was pregnant, and added that if Chunpe or "Brian" didn't have condoms, Garcia Rivera could bring them some.

68.     Further examination of the phone by SA Brooks Abramson of DOL-OIG, who is fluent in Spanish, yielded other relevant messages in this conversation. It appears that Chunpe was engaged in sex acts with JV-1 that day and was reporting back to Garcia Rivera about the things he was doing with her. SA Abramson found a voice message from Chunpe's phone to Garcia Rivera in which JV-1 tells Garcia Rivera she loves him.

69.     At one point, Garcia Rivera and Chunpe discuss JV-1 saying something about a condom breaking in the past. Garcia Rivera tells Chunpe that he heard from "Juan" that Avelino Sarceno Sarceno has twice cut the tip off of condoms he has used with JV-1 so that he can finish inside of her.

70.     SA Abramson's review also revealed Whatsapp audio-recorded messages exchanged between Garcia Rivera and a contact saved as "Jabalino" on October 20, 2019. Based on the mobile number and the voice in the messages, Jabalino appears to be Avelino Sarceno Sarceno. SA Abramson translated these messages into English.

71.     At 11:23 p.m., Sarceno Sarceno states, "I'm going to throw Catalina your way, fucker [laughter]. I have her here giving her dick [literally, "eggs," Spanish slang meaning testicles]. I'm with her you fucking guy."

72.     At 11:27 p.m., Garcia Rivera replies, "Easy, kiddo with my Catalina, dude. Don't you know we got married last night? Yeah, that's my woman, dummy. It's a shame that right

14

now we'll see where she's at. [U/I] of eggs [testicles]. Ender sent me a message seeing if he could come tonight right away he told me. I didn't even answer him, dummy; he's got me all worked up because, the truth, the truth is, well, one has necessities to fuck, idiot. All right then, go. But, and I fucked her beautifully, dude, and I didn't separate from her until I woke up with her in the morning, and [U/I]. But the shitty thing is that, that, that she can't even really cook for much of anything and one has to provide her food and buy her clothes. Those little fuckers don't eat beans, dummy [laughter]. She's having me buy her the food that they eat. That's enough, idiot, and [U/I] if later on they know that we have the woman there, shut up, dummy; everything is going to fall apart on me."

73.     SA Abramson also identified SMS messages between Garcia Rivera and Julio Cesar Veleta Veleta. In a conversation on September 28, 2019, Veleta Veleta tells Garcia Rivera that he has the "morra" and that "she" says it will be $100 or there is no deal.[3] Veleta Veleta asks Garcia Rivera how many are interested and says he is trying to determine whether it will be worth his while to bring her.

74.     Veleta Veleta and Garcia Rivera also exchanged messages in several chats on Facebook. These messages generally consist of each asking the other where they are or describing what they are doing. There are mentions in the messages of "Catali" or "Catalina" and "the white girl" on October 29, 2019 and November 4, 2019 that appear to refer to JV-1. There are also apparent references to the use or sale of controlled substances.

---

[3] Morra is a Latin American slang word used to refer to a "girl" or a "woman."

15

## E. A.M.'s Cell Phone (Subject of this Search Warrant Application)

75.      As explained above, when Bautista Martinez and the other subjects were arrested, Bautista Martinez's eight-year old son, A.M., was placed with relatives in the area and assigned a social worker, Jordyn Zabel.

76.      Zabel reported to law enforcement that A.M. had told her that the subjects in the County Line Road house frequently used cocaine, and he was able to mimic the snorting of powder cocaine. He also told her that he was aware of JV-1, whom he called Catalina, and that he had a video of her on his phone.

77.      A.M. was forensically interviewed with the aid of a Spanish interpreter on December 17, 2019. GLCSO Detective Scott Cody and FBI TFO Heather Spranger observed the interview from another room.

78.      At the outset of the interview, A.M. was asked to distinguish between the truth and a lie. A.M. told the interviewer that an example of a lie would be that his dad had molested Catalina. A.M. further stated that the truth was that "Eddie" (Evis Amabilio Garcia Rivera) brought Catalina to the house, but he was bothering her, so she called the police.

79.      A.M. also offered that Catalina is "crazy" and that he had once seen her run out of a bedroom in the County Line Road house screaming and only wearing a bra and underwear. He began to tell another story about JV-1, but stopped short and stated that he no longer remembered what had happened.

80.      During the interview, it became apparent that someone had instructed A.M. not to disclose any additional information to law enforcement. A.M. answered many questions by saying things like, "My dad is not here, so I don't remember anymore." When A.M. was asked if he knew "Cesar," he stated, "Noooo...," but looked to the side and smiled.

16

81.     A.M. told the interviewer that, since his dad's arrest, he had been using his phone to communicate with people that he and his dad knew. A.M. specified that he was using Whatsapp for these communications. I am aware that A.M. and his father (Bautista Martinez) were familiar with the subjects from the other houses JV-1 described being trafficked and sexually assaulted in Green Lake County and Fond du Lac County. As illustrated above from Garcia Rivera's phone, I am also aware that text and voice communications can be stored within the Whatsapp application and retrieved during an examination of a device with Whatsapp installed.

82.     When A.M. was asked about a video he may have on his phone of Catalina, he stated he did not remember. Immediately after the interview concluded, however, A.M. told Zabel in the hallway that he did, in fact, have a video of Catalina "on a table" in his phone. It should be noted that JV-1 disclosed being sexually assaulted on a table by subjects at the County Line Road house.

83.     Following the interview, Detective Cody went to the home where A.M. was staying and received consent from A.M.'s guardians, Maria Ofelia Patrino Sena and Socorro Socorro Patino Sena, to seize the phone. The phone is described as a Samsung SM-J337R4 cell phone, IMEI 35213910072761, telephone number 920-763-3324.

### F.  Searching Electronic Media

84.     Based on my training, experience, and research, I know that the cell phone that is the subject of this search warrant application has capabilities that allow it to serve as a wireless telephone, a digital camera, a portable media player, and a GPS navigation device. In my training and experience, examining data stored on a device of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

17

85.     I submit that there is probable cause to believe that evidence is presently stored on

the cell phones for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that electronic data and files or remnants of such data or files can be recovered months or even years after they have been downloaded onto a cell phone, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when data or files have been deleted, they can be recovered months or years later using forensic tools. This is so because even when it is deleted, the data does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted data or files, or remnants of deleted data or files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.

c.  Wholly apart from user-generated files, cell phones contain electronic evidence of how those phones have been used, what they have been used for, and who has used them. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

86.     As further described in Attachment B, this application seeks permission to locate

not only data and files that might serve as direct evidence of the crimes described in the warrant,

but also for forensic electronic evidence that establishes how this cell phone was used, the purpose

of its use, who used it, and when. There is probable cause to believe that this forensic electronic

evidence will be on the cell phone because:

a.  Data on the cell phones can provide evidence of data or files that were once on the phones but have since been deleted or edited. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the cell phone was in use.

b.  As explained herein, information stored within a cell phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and

18

prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage media, include cell phones (*e.g.*, communications, images, transactional information, records of session times and durations, and Internet history) can indicate who has used or controlled the electronic storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. Further, cell phone activity can indicate how and when the cell phone was accessed or used. Such information allows investigators to understand the chronological context of electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a cell phone may provide crucial evidence relating to the physical location of other evidence and suspects. For example, images stored on a cell phone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media. Last, information stored within cell phones may provide relevant insight into the user's state of mind as it relates to the offense under investigation.

c. A person with appropriate familiarity with how a cell phone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cell phones were used, the purpose of their use, who used them, and when.

d. Further, in finding evidence of how a cell phone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is *not* present. For example, the presence or absence of anti-virus programs or malware (and associated data) may be relevant to establishing user attribution and intent.

87. A thorough search of the cell phone for information that might be stored on it requires imaging of the phone to ensure the accuracy and completeness of the data recorded on the cell phones, and to prevent the loss of the data either from accidental or intentional destruction.

88. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit imaging or otherwise copying the cell phone named in the warrant and a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that

19

might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

89.     Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**IV.     Conclusion**

90.     As explained in Section III of this affidavit, there is probable cause to believe that the six adult male subjects described above, and others, were engaged in sex trafficking of a child and by force, fraud, and coercion, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(1), (b)(2), and 1594(b). There is also evidence to believe that an unknown subject or subjects have engaged in attempted obstruction of a sex trafficking investigation in violation of Title 18, United States Code, Section 1591(d).

91.     Based on the statements made by JV-1, the interviews of the subjects, the contents of Garcia Rivea's phone, and the statements made by A.M., there is probable cause to believe that A.M.'s cell phone will contain evidence related to these crimes.

92.     I respectfully submit that this affidavit establishes probable cause for the issuance of a warrant to search the Property described in Attachment A, and for the seizure of the evidence described in Attachment B.

20

## ATTACHMENT A

## DESCRIPTION OF LOCATION TO BE SEARCHED ("PROPERTY")

A Samsung SM-J337R4 cell phone, IMEI 35213910072761, associated with telephone number 920-763-3324, which is presently stored in an evidence locker at the Green Lake County Sheriff's Department, 571 County Road A, Green Lake, Wisconsin:

---------------------

**ATTACHMENT B**

**EVIDENCE TO BE SEIZED**

All evidence, instrumentalities, information, records, and contraband relating to violations of Title 18, United States Code, Sections 1591(a)(1)(b)(1) (sex trafficking by force, fraud, or coercion); 1591(a)(1) and (b)(2) (sex trafficking of a minor); 1594(b) (conspiracy to engage in sex trafficking); 1594(d) (attempted obstruction of a sex trafficking investigation) including:

1. Electronic communications, including text messages, Whatsapp and other instant messages; audio or video-recorded messages; emails; and other forms of written messages concerning JV-1 or other potential victims of sex trafficking;

2. All images or videos depicting JV-1 or other potential victims of sex trafficking, narcotics, currency, and sex or drug paraphernalia;

3. All searches and queries for purposes of translation between English and Spanish, including within the Google Translate application;

4. Any GPS location information and/or data from maps applications;

5. All call logs;

6. Contact lists, to assist with the interpretation of the communications documented in the call logs and text messages; and

7. Evidence of user attribution, showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, notes, documents and Internet browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

22

Case 2:19-mj-01387-WED   Filed 01/03/20   Page 23 of 23   Document 1